# In the United States District Court
# for the District of Utah, Central Division

| | |
|---|---|
| ALISSA R. BROWN, an individual,<br><br>                    Plaintiff,<br><br>vs.<br><br>LKL ASSOCIATES, INC., a Utah corporation,<br><br>                    Defendant. | MEMORANDUM DECISION<br>and<br>ORDER<br><br><br>Case No. 2:03 CV 116 JTG |

      This matter came before the Court for trial without a jury on February 14, 2005 to and including February 18, 2005.  Final arguments were heard on February 25, 2005.

      In accordance with attached Findings of Fact, Conclusions of Law, and further findings contained in the discussion set forth below, the Court denies defendant's Motion to Dismiss as a Matter of Law which was filed at the conclusion of plaintiff's case, because plaintiff did establish a prima facie case based on retaliation for having filed a complaint for sexual harassment.  Defendant dispelled inferences of pretext by the production of abundant evidence of legitimate business reasons as the motivating factor for termination of plaintiff.  Plaintiff failed to demonstrate that defendant's evidence of legitimate business reasons was mere pretext or that retaliation was the motivating factor for her discharge.  Under the totality of all facts and circumstances, plaintiff failed to carry the burden of proof to establish intentional retaliatory discrimination.  Accordingly, the Court renders its verdict in favor of defendant – no cause of action – and does not reach the matter of damages.  Each party to bear their own costs and

attorney fees.

### I. PRIMA FACIE CASE – ELEMENTS OF A SEXUAL RETALIATION CLAIM

Brown brings her claim against LKL Associates under 42 U.S.C. § 2000e-3(a), which provides in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

The Tenth Circuit Court of Appeals has recognized that a plaintiff must show the following essential elements to establish a case of retaliation: (1) she was engaged in opposition to Title VII discrimination (protected activity); (2) she was subject to adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there is a causal connection between the protected activity and the adverse employment action. *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1263 (10th Cir. 1998). In addition, Tenth Circuit law requires a plaintiff to carry the ultimate burden that she was "intentionally retaliated against by her employer." *Id.* at 1266.

Where there is no direct evidence of retaliation, the retaliation claim is analyzed under the familiar burden shifting analysis initially set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973). In *Arnett v. University of Kansas*, 371 F.3d 1233, 1237 (10th Cir. 2004), the Tenth Circuit stated that "[o]nce a plaintiff established a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action." If the defendant meets his burden,

"the plaintiff must be allowed to demonstrate that the defendant's offered reasons are a mere pretext for discrimination." *Id*. The fact finder is then confronted by the necessity to balance pretext against legitimate business reasons, and plaintiff must carry the ultimate burden to establish intentional retaliation by showing that plaintiff's claim of sexual harassment was the principal motivating factor for her termination.

The elements of plaintiff's prima facie case will next be discussed.

**A.    Engaged in Protected Activity Opposition to Title VII Discrimination**

Plaintiff may maintain a retaliation claim if she has a "reasonable good faith belief" that the underlying conduct violated Title VII. *Crumpacker v. Kansas Dept. of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003). *See also Clark County Sch. District v. Breeden*, 532 U.S. 268, 269, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001). In *Crumpacker*, the Tenth Circuit declared "strong policy" supports "prophylactic [sic] legislation designed to remedy and deter discrimination,"and stated:

> By permitting plaintiffs to maintain retaliation claims based on a reasonable good-faith belief that the underlying conduct violated Title VII, employees are able to report what they reasonably believe is discriminatory conduct without fear of reprisal. . . .  If plaintiffs are not protected from retaliation when they challenge conduct that they have a reasonable good-faith belief is prohibited by Title VII, "the incentives for asserting otherwise valid claims at the margins of Title VII are drastically reduced, if not eradicated."

*Crumpacker*, 338 F.3d at 1172 (*quoting Robben v. Runyon*, 203 F.3d 836, 2000 WL 123421, at *5 (10th Cir. Feb. 1, 2000) (unpublished opinion)). Hence, such claims of retaliation may be asserted "even when the underlying conduct may not constitute a violation of Title VII." *Id.* at 1172.

In the case at bar, Brown was a willful participant in the sexually charged atmosphere and hostile work environment that existed at LKL at all times during her employment prior to July 16, 2002, when the second of two requests was made for a picture of her breasts. Brown became offended and made a complaint of sexual harassment to John Sundwall, Chief Administrative Officer, on July 17, 2002.

Shortly before July 16, 2002, Todd Casey, a senior employee who had been Store Manager before being elevated to Director of Sales and Marketing, and Reagan Sandberg, Brown's supervisor and who was Store Manager in 2002, were engaged in a conversation with Brown. The conversation had to do with the amount of smut on the internet and how anyone could have an internet website and maintain anonymity. Casey observed that a person could make a lot of money doing porn on the internet. Brown stated that she could not establish a website on the internet because no one would visit hers. Casey then responded that he would and requested a picture of her breasts. Brown stated this conversation made her feel very uncomfortable, but attempted to laugh it off and immediately left the room. Prior to that, among other things, Brown had discussed with Casey and Sandberg the lurid and explicit sexual conduct of her friend, Ruthanne Parker, including Parker's willingness to perform sex acts. On July 16, 2002, while Brown was in Sandberg's office, Casey entered the room and again requested a picture of her breasts. Brown replied that her husband would not approve and immediately left the office.

The next day, on July 17, 2002, Brown complained to Sundwall about Casey's and Sandberg's conduct. The substance of her complaint to Sundwall was that Casey had asked

4

for a picture of her breasts on two different occasions, the last of which was yesterday. She also revealed that Sandberg had gone to visit a friend of Brown's, Ruthanne Parker, during business hours to check out the allegedly red dye color of her pubic hairs. Immediately following the complaint, LKL took action: Sundwall conducted an investigation, including confronting Casey and Sandberg, which caused immediate cessation of any behavior which Brown viewed as sexually harassing. On July 18, 2002, LKL held a meeting called by Kim Norris, one of the owners of the business, at which meeting Lanny Norris, another co-owner of the business, John Sundwall, Reagan Sandberg, Todd Casey, and Alissa Brown were in attendance. The day after the meeting, Kim Norris met with Sandberg and Casey regarding Brown's complaint, and gave each of them a disciplinary notice that each signed and the notices were placed in their personnel files. The notices stated that Sandberg and Casey had "been involved in situations and circumstances in which a female employee believed his comments and innuendo exceeded the bounds of appropriate moral judgment," and each were warned that another incident of this nature would cost them their job. It is clear to the Court that the actions of LKL to stop the conduct shows that Kim Norris, Sundwall and LKL took Brown's complaint very seriously and believed on the face of it that the complaint was made under a reasonable good faith belief that a line had been crossed which amounted to sexual harassment of her personally.

        Although Brown was not offended by sexually explicit talk and jokes, and in fact was a willing participant throughout the first nine months of her employment, this does not *per se* preclude Brown from asserting her belief of sexual harassment once the sexual conversations changed from sexual stories and jokes to apparently serious requests for pictures of her breasts.

This Court as fact finder determines that plaintiff's asserted belief was reasonable and in good faith. Casey was a senior executive, equal as a peer to Sundwall, the Chief Administrative Officer at the store. Casey's requests cannot be deemed as isolated, off handed remarks or simple teasing because he requested the breast pictures on two separate occasions. Notwithstanding the hostile work environment that Brown willfully participated in at LKL, these requests had to do with Brown personally, beyond explicit sex talk and jokes. Brown should not have been expected to tolerate such an intrusion from a company executive.

The Court determines that when Brown complained to Sundwall about being sexually harassed, she had a reasonable good faith belief that she had been sexually harassed. Accordingly, Brown engaged in protected activity – free from retaliation – by making the charge, whether or not the conduct complained of constituted a violation of Title VII by reason of sexual harassment. The Court concludes that the first element of the plaintiff's prima facie case was established.

**B.  Adverse Employment Action Subsequent to Protected Activity**

To be an adverse action, the employer's conduct must be "materially adverse" to the employee's job status. *Meiners v. University of Kansas*, 359 F.3d 1222, 1230 (10th Cir. 2004) The adverse employment action must amount to a significant change, such as "firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. (quoting *Aquilino v. University of Kansas*, 268 F.3d 930, 934 (10th Cir. 2001)), *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

In the case at bar, on July 25, 2002, a week after the complaint, Sundwall had a

6

meeting with Brown and gave her an oral disciplinary notice for "failing to halt and/or report abusive conditions." Sundwall had also prepared a written disciplinary notice, but called an end to the meeting because Brown became very upset when Sundwall started to discuss the substance of the disciplinary notice he had prepared to give her. Instead, Sundwall placed the notice in Brown's personnel file without her ever seeing it. The notice was given for "failing to halt and/or report abusive conditions," and stated:

> Ms. Brown has been warned on a number of occasions to avoid using her colorful language. Through the use of such language and by joining in on inappropriate conversations, fellow employees believed she was insensitive to topics involving sexual content. Ms. Brown allowed the situation to continue until it was out of hand. Even at that point, Ms. Brown failed to bring the situation to management's attention. She allowed it to continue until she believed it was abusive. . . . Ms. Brown has been given a copy of the company's policy on harassment and has been told that she is to call a halt to conversations heading in the wrong direction. If this does not work, she is to contact senior management immediately. She has also been told to avoid the colorful language.

Arguably, this notice could be found to constitute in and of itself an adverse employment action, but the Court does not so find. Rather, the Court regards it as evidence along with matters presented to support an inference of pretext concerning reasons given for the adverse employment action of termination of plaintiff which occurred six weeks later.

On July 26, 2002, Brown's internet usage was limited to the internal company site because she allegedly abused her internet privileges. Sundwall met with Brown about this problem, but again never showed her the written disciplinary notice or asked her to sign it because she became upset. This notice stated that Brown must "curtail personal activities on company time." Sundwall delayed giving the notice to Brown until July 26th, despite the fact that

7

Sandberg had told Sundwall about the internet problem in June, and Sundwall had investigated and found improper internet use the week prior to Brown's complaint. Sundwall presented the matter to Brown only after Brown made her complaint on July 17, 2002.

On September 10, 2002, Sandberg terminated Brown after he observed her failure to answer in a prompt manner customer telephone calls for a second time on that day. After that, Sandberg met with Sundwall, explained his frustration with Brown and received permission to terminate her. Sandberg terminated Brown orally and stated that he was "sick of her attitude" and her failure to answer the telephone. After terminating Brown, Sandberg showed Sundwall the termination notice, which had been signed by Brown. The notice was blank and devoid of any explanation or reason for termination. Sundwall said the notice was inadequate, and directed Sandberg to prepare another notice stating all of the reasons for the termination action. This was done, and placed in Browns personnel file without further discussion with Brown or without presenting a copy to her.

This Court finds that the termination and LKL's conduct were "materially adverse" to Brown's job status, constituting a very significant job change – namely, termination from LKL.

**C.   Causal Connection**

The requisite causal connection may be shown by producing evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. *McGarry v. Board of County Commissioners*, 175 F.3d 1193, 1202 (10th Cir. 1999). In *Meiners v. University of Kansas*, 359 F.3d at 1231, the court stated that "[a] six-week period between protected activity and adverse action may be sufficient, standing alone,

to show causation." However, "[u]nless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation." *Id*. (*quoting Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999) (emphasis in original)).

The Court concludes that the proximity in time between Brown making her complaint of sexual harassment and Brown's termination six weeks after making her complaint, coupled with other evidence of apparent pretext, created an inference of retaliatory motive and the required causal connection. The nexus between Brown's protected conduct in making the charge of sexual harassment and the adverse employment action, is shown by the disciplinary notice, on July 25, 2002, one week after Brown's complaint, for "failing to halt and/or report abusive conditions," a disciplinary write up she was told was given because she had failed to present her complaint of sexual harassment in a timely manner. Also, on July 26, 2002, Sundwall had another meeting with Brown to issue her a further disciplinary notice concerning Brown's internet usage, stating Brown must "curtail personal activities on company time." Brown was never shown this written disciplinary notice, and in fact was shown only one disciplinary write up of the several which were placed in her personnel file prior to her termination on September 10, 2002. In addition to the foregoing, plaintiff made a further showing of causal connection by presenting evidence sufficient to support an inference of pretext in her case in chief.

## II.  BURDEN SHIFTING ANALYSIS

Plaintiff having established a prima facie case, the Court now looks to the familiar *McDonnell Douglas* burden shifting analysis. In *Burrus v. United Telephone Company of*

9

*Kansas*, 683 F.2d 339, 343 (10th Cir. 1982), the court determined that "[t]he defendant need not prove the absence of retaliatory motive, but only produce evidence that would dispel the inference of retaliation by establishing the existence of a legitimate reason."  In *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1263 (10th Cir. 1998), the Tenth Circuit found "[i]t is well settled that the burden of persuading the factfinder that the defendant intentionally discriminated remains at all times with the plaintiff."  In *Marx v. Schnuck Markets Inc.*, 76 F.3d 324, 328 (10th Cir. 1996), the court applied a "motivating factor" approach to a retaliation claim.  "When the immediate cause or motivating factor of a discharge is the employee's assertion of statutory rights, the discharge is discriminatory . . . whether or not other grounds for discharge exist.  *If retaliation is not the motivating factor, then the discharge is not unlawful*."  *Id*. (emphasis added).

### III.  PLAINTIFF'S SHOWING OF PRETEXT

In her case in chief, plaintiff put forth evidence that established an inference of pretext.  In this regard, plaintiff showed that LKL failed to follow its written policy on disciplinary notices, as to both written and oral warnings.  Sundwall testified that he had written the LKL handbook, yet he disregarded the requirement to discuss both written and oral warnings with employees and to provide an opportunity to respond after acknowledging receipt of such warnings.  In the case of written warnings, this was to be done by requiring the employee to sign a copy.  Kim Norris testified that LKL expected those policies to be followed by all LKL employees, including those at the West Jordan store.

Plaintiff put forth evidence of pretext regarding the disciplinary notices that immediately followed Brown's complaint.  In regards to the internet, even though Sundwall was

told about Brown's internet use in June, and testified that he reviewed her internet use the week prior to Brown's complaint, he chose not to act on this knowledge until the week following Brown's complaint of sexual harassment.  Moreover, once Brown's unlimited internet access was taken away on July 26, 2002, her internet usage was no longer a basis for a legitimate business reason for her termination six weeks later.  Nevertheless, it was asserted thereafter, along with other reasons for termination.

    Plaintiff established at trial that Brown's actual phone use was not as severe or improper as defendant claimed it to be.  This asserted overstatement of telephone usage for private calls was presented in plaintiff's case in chief to deflate defendant's anticipated claims of legitimate business reasons for termination.  However, even if the time spent on the phone most often did not exceed the time allotted to her for breaks and lunch, the reduced amount of use was not shown to have occurred only at such breaks, and did not refute the inappropriate manner of plaintiff's phone use during business hours.

    Plaintiff also put forth evidence of pretext in her case in chief that Sandberg continued to blame Brown for an incident that occurred with her friend Ruthanne.  Sandberg had come to know Ruthanne from her visits at LKL to see Brown, and from graphic conversations with Brown about Ruthanne's sex life.  In May 2002, Sandberg was told that Ruthanne had died her pubic hair pink.  Sandberg requested and obtained from plaintiff Ruthanne's address so as to go see for himself.  Sandberg and Rowland Hickman drove to Ruthanne's home, during company time, and Sandberg saw Ruthanne.  After Sandberg's trip to Ruthanne's, Sandberg treated Brown differently and told Brown that Ruthanne was not allowed at LKL or on LKL property anymore.  Sandberg blamed Brown for this incident because Ruthanne was a friend of Brown's and Brown

set the meeting up between Sandberg and Ruthanne.

Finally, Sandberg, who himself was disciplined in connection with Brown's sexual harassment complaint, felt "sandbagged" by her complaint and was emotional and resentful about it, and blamed Brown for the RuthAnne incident, and made the decision as her direct manager to terminate Brown.

## IV.  DEFENDANT'S LEGITIMATE BUSINESS REASONS FOR TERMINATION

Defendant presented evidence of legitimate business reasons for termination of Brown. This evidence presented in defendant's case in chief was not challenged by the presentation of contradictory evidence by plaintiff. In this regard defendant put forth evidence of numerous reasons to dispel the inference of retaliation and to establish the existence of legitimate business reasons for Brown's termination. Testimony of Amanda Cook was given by agreement of both sides during plaintiff's case in chief. She had been a customer service representative before becoming an administrative assistant at the West Jordan office, and worked with Brown from February to May 2002. Cook testified that during the time she worked with Brown, she made numerous complaints to Sandberg and to Casey that Brown did not do her share around the customer service office. For example, Brown ignored customers and would act busy in order to wait for Cook to help the next customer so Brown would not have to. Cook would also do all stocking in the store because Brown would never do it or assist her in stocking the items. Brown was continuously told to help stock items, particularly certain high use items, yet refused to make any effort to keep items stocked. This testimony went unrefuted.

After Cook left LKL, Sandberg or Crapo had to stock the store shelves because Brown continued to ignore that responsibility. At some point Brown was asked to at least tell

Crapo when certain high use items became low so he could restock them.  Brown also ignored the responsibility to just tell Crapo when items were low.

Defendant established that Brown was initially hired to work part-time for Sundwall as his administrative assistant and part-time as a Customer Service Representative (CSR).  Sundwall gave Brown a verbal warning on April 22, 2002 for making mistakes on company letters because she was on personal phone calls while working.  The warning stated "performance of this nature is not acceptable and must cease immediately . . . personal phone calls must be eliminated."  After numerous mistakes in letters and emails prepared by Brown, Sundwall no longer used Brown as his administrative assistant due to these errors and Brown's insubordinate attitude regarding Sundwall's corrections.

Testimony presented by defendant established that Brown never learned LKL's product codes or any of the specific needs of LKL customers.  This lack of knowledge cost LKL time and money, in addition to unnecessary problems with its customers.  For example, on April 19, 2002, Brown was written up for her mistake on a "Muddy Boys" order which required LKL to make an additional delivery.  This Discipline Notice states that this kind of mistake has "happened once or twice before."  On June 14, 2002, Sandberg documented a verbal warning given to Brown regarding a delivery error with Mark Sudbury.  Brown failed to give Sandberg a message about a mistake made on the delivery that Sudbury had to get that day and needed it that day to finish a job on time.  As a result, Sudbury was forced to use LKL's competitor and has not used LKL since this incident.  On June 24, 2002, Brown received a written warning from Sandberg because she had made a mistake on a BK Drywall order causing loss of time to LKL and the customer.

Testimony established that Brown also had problems with the invoices she prepared for LKL customers. As a result of ongoing problems and customer complaints with invoices prepared by Brown, a special process was set up to check all of the invoices produced by Brown before they were sent out to LKL customers. This process had never been set up for any CSR before Brown or since Brown's termination. For example, Aaron Critchfield, a LKL customer, testified he finally had to complain about Brown to Sandberg because there were so many irregularities and blatant errors on his statements, such as: wrong materials, incorrect pricing of items, wrong amounts of materials, and incorrect billing amounts. Critchfield testified that he never had this problem before or since Brown's employment at LKL. Critchfield testified that he needed to review his statement every month and sit down with Sandberg to change Brown's mistakes. Critchfield finally stopped using Brown altogether as the CSR, and placed all orders directly through Sandberg.

In June of 2002, in an effort to make Brown a better employee, Sandberg created a list of chores that Brown was to perform as a CSR. This list detailed items that needed to be performed by CSRs when they were not busy helping customers. Even after creating this list for Brown, she failed to perform many of the tasks that needed to be done in the store, such as: stocking selves, filling the paint machine, ordering items, paging the yard manager for customers, organizing the storage room, notifying yard workers to refill nails and screws, being familiar with LKL's product codes, and learning the standard needs of LKL's customers.

Sometime between February and March 2002, Sandberg had his first conversation with Brown about answering the phones promptly. The conversation stemmed from a missed phone call that went to voicemail and was not checked for over an hour. Additional misuse of

personal use of phones persisted.

On September 10, 2002, Sandberg observed Brown not answering a customer call and letting the phone ring continuously in front of a customer in the store. Sandberg talked to Brown about answering the phone promptly and explained how it looked bad to other customers in the store. Later that day, Sandberg observed Brown failing to answer customer telephone calls for the second time. Sandberg determined he was "sick of her attitude" and wanted to fire Brown that day. Sandberg met with Sundwall, explained his reasons for terminating Brown, and received approval to terminate Brown. Sandberg then met with Brown and told her she was terminated.

Additional matters bearing on legitimate business reasons for termination are set forth in the attached Findings of Fact and Conclusions of Law.

This Court rules that defendant produced sufficient evidence to dispel the inference of retaliation by its establishment of legitimate business reasons. Plaintiff argued that the existence of pretext defeated defendant's purported legitimate business reasons, but failed to carry the burden of persuading the factfinder with evidence that the defendant intentionally discriminated against defendant, or that plaintiff's charge of sexual harassment was a primary or motivating cause for her termination. The Court finds that legitimate business reasons were the motivating cause for the termination of Brown. This Court also finds that legitimate business reasons outweigh any inference of pretext or that the motivation for her termination was that Brown had filed a charge of sexual harassment. This conclusion is further bolstered by the evidence dispelling any inference of intentional discrimination, as set forth in the next section.

### V.   INTENTIONAL DISCRIMINATION – MOTIVATION OF EMPLOYER

The burden to show intentional discrimination remains at all times with the plaintiff.  *See Gunnell v. Utah Valley State College*, 152 F.3d at 1263.  In other words, plaintiff must shoulder the burden to prove that the motivating factor or immediate cause of Brown's discharge was her complaint of sexual harassment.  This Court finds that plaintiff failed to carry that burden.  "Once a plaintiff and a defendant meet their initial burdens and the plaintiff has been allowed to demonstrate that the defendant's purported reasons were actually pretexts, the court must decide '*which party's explanation of the employer's motivation it believes*.'"  *Berry v. Stevinson Chevrolet*, 74 F.3d at 987 (emphasis added) (*quoting Love v. RE/MAX*, 738 F.2d 383, 386 (10th Cir. 1984) and *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)).  Moreover, in *Archuleta v. Colorado Department of Institutions*, 936 F.2d 483, 487 (10th Cir. 1991), the court noted that the determination of what motivates an employer's conduct is both sensitive and difficult and is treated as a pure question of fact subject to the clearly erroneous standard.  Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Id*.  In this case, the Court rules that plaintiff failed to carry the burden of establishing that defendant's legitimate business reasons were pretextual or that defendant's motivation was intentional discrimination.

The Court concludes that LKL's primary legitimate business reason for terminating Brown was that she was a substandard employee throughout her employment with LKL.  The fact that Brown was an at-will employee and LKL did not terminate Brown prior to her complaint does not controvert LKL's legitimate reasons for her termination.  Although this

begs the question why did LKL not terminate Brown earlier, the fact that LKL continued to make an effort with Brown as an employee does not prove motivation of intentional retaliation based upon discrimination. This only shows that LKL was willing to continue to work with Brown, perhaps for too long. Or, perhaps because her father was a senior executive in charge of human resources, it would have been awkward to fire Brown prior to her father's termination that was effective in May of 2002. Whatever the cause for delay, defendant had the right to terminate Brown on several occasions – but this was complicated on July 17, 2002 when Brown filed her charge of sexual harassment. On and after that date, the officers and managers of defendant made sure that the allegedly hostile work environment which had existed and as to which plaintiff was a very willing participant, should not be such as to offend plaintiff in any way. The atmosphere was cleared of sexually explicit talk, particularly in plaintiff's presence. She was encouraged to do her work as though nothing had happened. However, plaintiff continued to demonstrate a lack of proper work performance. That was manifest and came to a head on September 10, 2002 when plaintiff's attitude and lack of concern about answering telephones, as well as a lack of concern about customer relations caused her termination.

      Even though plaintiff presented evidence of pretext by LKL in her case in chief, no evidence was presented in contradiction of the specific evidence of substandard job performance presented by defendant. There was no rebuttal evidence offered by plaintiff. The showing of pretext which was sufficient to present a prima facie case was dispelled by evidence presented by defendant in its case in chief. Plaintiff did not establish that the motivating factor for Brown's termination was her assertion of statutory rights. Therefore the discharge was not unlawful. The Court concludes that defendant's legitimate, non-discriminatory business reasons

for terminating Brown were valid and outweigh Brown's evidence of pretextual reasons for her termination.

This is an unusual and unique case. Plaintiff was an "at will" employee subject to termination at any time, without cause, which of course would include termination for unsatisfactory job performance. The evidence before the Court would have supported termination soon after employment began, and at various times thereafter, including when termination occurred on September 10, 2002. For whatever reason, plaintiff was allowed to continue as an employee even though she was orally and in writing reprimanded on several occasions. No doubt the presence of her father, one of the senior officials, had something to do with the decision not to terminate before her father was terminated in May of 2002.

At the conclusion of plaintiff's case in chief, it appeared to the Court that defendant's reasons for terminating plaintiff on September 10, 2002 were pretextual. This raised the question whether plaintiff's claim of sexual harassment made on July 17, 2002 was the dominant motivation for her termination. In its case in chief, defendant presented a great deal of evidence which established that the primary motivating factor for defendant's termination was legitimate business reasons, thus dispelling inference of pretext. After full trial, the Court finds and rules that plaintiff did not carry the burden of proving that plaintiff's termination was motivated by intentional sexual discrimination rather than legitimate business reasons.

Based upon the aforesaid, and after full consideration of the record before the Court, it is hereby

**ORDERED**, that defendant's Motion for Judgment as a Matter of Law which was presented at the conclusion of plaintiff's case in chief is Denied; it is

**FURTHER ORDERED**, that by a preponderance of evidence in favor of defendant, the verdict of this Court is hereby rendered in favor of defendant – no cause of action; it is

**FURTHER ORDERED**, that the Court need not reach the matter of damages and each party shall bear their own costs and attorney fees.

DATED this 11th day of May, 2005

_____
J. THOMAS GREENE
UNITED STATES DISTRICT JUDGE